[Cite as *In re D.B.*, 2024-Ohio-3391.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: D.B. | : | APPEAL NOS. C-240076 |
| | | C-240077 |
| | : | C-240078 |
| | | TRIAL NOS. 23-0085-01-Z |
| | : | 23-0085-02-Z |
| | | 23-0085-03-Z |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgments Appealed From Are:  Reversed and Appellant Discharged

Date of Judgment Entry on Appeal: September 4, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Norbert Wessels*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Margaret Kane*, Assistant Public Defender, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant D.B., a juvenile, appeals the judgments of the Hamilton County Juvenile Court adjudicating him delinquent of two counts of felonious assault in violation of R.C. 2903.11(A)(2), felonies of the second degree if committed by an adult; one count of discharge of a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3), a felony of the second degree if committed by an adult; and possession and facilitation specifications for each count. After a careful review of the record, we conclude that, taking the evidence in the light most favorable to the State, there is insufficient evidence to support D.B.'s adjudications. Accordingly, we reverse the judgments of the juvenile court and discharge D.B. from further prosecution.

### *Factual and Procedural History*

{¶2} On January 4, 2023, a shooting occurred near a BP gas station in the Price Hill neighborhood of Cincinnati. The complaining witness and her boyfriend were driving in a car on Warsaw Avenue when a stray bullet pierced the front passenger side door and penetrated the complaining witness's leg. On January 11, 2023, D.B. was charged with the shooting. He faced complaints for two counts of felonious assault, one count of discharging a firearm on or near a prohibited premises, and possession and facilitation specifications.

{¶3} The case was tried in juvenile court on April 26, 2023, and May 3, 2023. At trial, the State presented seven witnesses: (1) Officer Andrew Yenco; (2) Officer Matthew Shideler; (3) Officer William Nastold; (4) Officer Brandon Conley; (5) the complaining witness; (6) the complaining witness's boyfriend; and (7) Officer Jacob Wloszek.

{¶4} Yenco, an officer with the Cincinnati Police Department's Investigative Unit, was the State's first witness. Yenco explained that he was responsible for retrieving surveillance footage from four different commercial establishments whose surveillance systems had potentially recorded the shooting. These included the BP gas station, a local laundromat named Washland, a nearby McDonald's, and the Metro bus company. Yenco personally recovered surveillance footage from the BP gas station, Washland, and McDonald's by downloading videos from their recording systems, but he obtained footage from Metro by request.

{¶5} Yenco testified that, after obtaining the surveillance footage from the four businesses, he reviewed each video to determine whether it captured the incident. According to Yenco, he identified relevant portions of each video and then spliced them together to create a compilation. He admitted that there were some time discrepancies between the time stamps on each video. The compilation video, but not the original source surveillance footage, was introduced at trial as State's Exhibit 1 ("the compilation video").

{¶6} When the State attempted to play the compilation video, defense counsel objected, arguing that Yenco was not qualified to authenticate the video and that it constituted an improper summary. In response, the State contended that Yenco could authenticate the compilation because he personally downloaded and obtained the source footage. The State further argued that the video was admissible as a summary because the Metro, BP, Washland, and McDonald's videos were too voluminous to be presented on their own. Ultimately, the magistrate overruled the defense's objection, admitted the compilation video into evidence, and allowed it to be played.

3

{¶7}   We have independently reviewed the compilation video.  As described by Yenco, it begins with footage from Metro that depicts three individuals sitting on a moving Metro bus.  Two of the individuals are younger males, and one is an older male.  One of the younger males, later identified as D.B., is wearing a dark-colored hoodie and light-colored pants.  After a period of time, the bus stops, and the three individuals exit from the bus.

{¶8}   The compilation video then transitions from the Metro bus footage to what Yenco described as the BP footage.  This portion of the video depicts four individuals exiting from a Metro bus.  One of the individuals who appears to be the older gentleman from the Metro bus video walks towards the BP store.[1]  Two of the people who got off the bus remain in the back of the BP parking lot.

{¶9}   The compilation video then shows a black Jeep enter the BP near where the two people are standing.  The Jeep backs up and pulls away.

{¶10} A second video then appears in the bottom right corner of the compilation, running simultaneously with the BP footage.  According to Yenco's testimony, this second video is from Washland.  In contrast to the BP footage, which is in color and is fairly clear, the Washland video is black-and-white, extremely grainy, and of very low quality.  It is from a further distance as well, making it more difficult to make out the people and events depicted in the footage.

{¶11} Both the Washland and BP video clips continue on the screen.  The BP footage shows the two people in the parking lot who got off the bus walk in opposite directions away from the BP.  After a delay, the Washland video then shows a figure cross the street, and a single muzzle flash go off.  The person then runs in the direction

---

[1] No witness identified this individual or conclusively testified that he was in fact the same person who appeared in the Metro video clip.

away from the BP. Due to the low quality of the Washland video, it is impossible to ascertain the identity of the person depicted crossing the street.

{¶12} At this point in the compilation video, a third source of footage appears in the left lower corner of the screen. Yenco identified this as the footage from McDonald's. This clip depicts a green vehicle driving down the road.

{¶13} The simultaneously-played clips from BP, Washland, and McDonald's then conclude, and a fourth video appears which takes over the entire screen. Yenco identified this video as originating from BP. It depicts the green car pulling into the parking lot of the gas station. The complaining witness's boyfriend exits from the driver's seat to render aid to the complaining witness. The compilation video then concludes.

{¶14} In addition to describing the compilation video, Yenco also testified to D.B.'s identification. He indicated that he followed the person he believed to be D.B. across the various video clips by looking at his black shoes.

{¶15} Both the complaining witness and her boyfriend also testified. According to the boyfriend, on the night of the incident, he was driving a green Kia Sol in which the complaining witness was a passenger. They were in the area of the McDonald's when he saw someone shooting and realized his girlfriend had been shot through the car. The complaining witness added additional details. She indicated that their car was stopped at a stop sign when she heard three shots being fired. She relayed that a bullet had entered the car door and pierced her leg. Neither the complaining witness nor her boyfriend were able to identify the shooter.

{¶16} Shideler testified to his involvement in collecting shell casings near the intersection of Warsaw Avenue and Glenway Avenue. According to Shideler, he

recovered these casings in a manner suggesting they were from the shooting depicted in the Washland video clip. But he did not testify as to what caliber the shell casings were or what gun they might have come from.

{¶17} Nastold testified that he also responded to the scene. He recounted finding the complaining witness with a gun shot wound to the leg, as well as a bullet hole in the passenger door of the Kia Sol.

{¶18} Conley testified that he also participated in the investigation and spoke with the complaining witness and her boyfriend. He further testified that he reviewed the surveillance videos obtained by Yenco and that D.B. could be identified by his clothing in the various segments. He indicated that D.B. was wearing gray pants and light-colored shoes.

{¶19} Wloszek testified that D.B. had been brought into the station for questioning about the shooting and that he was the investigator who interviewed D.B. Wloszek explained that D.B. identified himself in a still photograph taken from the Metro bus surveillance footage as one of the individuals who was on the Metro bus on the evening of the incident.

{¶20} Through Wloszek's testimony, the State admitted a video recording of D.B.'s interview with police, which was played at trial. The video contains D.B.'s responses to various questions about the night of the incident. For example, in response to a question about his movements that night, D.B. indicated that he rode the bus to the Price Hill neighborhood and got off the bus near the BP and the McDonald's. D.B. further admitted to leaving the BP in the same direction that the Washland video shows a person crossing the street, although he was not shown still photographs of the area and was not asked to identify himself in any footage other

than the Metro footage. D.B. indicated that he encountered individuals who had been trying to "jump" him when they drove up to the BP station after he got off the bus. He did not identify the type of car they were driving. Wloszek repeatedly asked D.B. if there was anything he wanted to share that happened that night, but D.B. never mentioned a shooting, and Wloszek never directly asked him about one. D.B. eventually asked for his mother, and the interview concluded.

**{¶21}** The defense called no witnesses.

**{¶22}** On May 9, 2023, the magistrate dismissed the charges against D.B. on the grounds that the State failed to prove beyond a reasonable doubt that D.B. was the shooter. Notably, the magistrate stated:

> Video of a person running across the street wearing dark clothing similar to the defendant after losing video continuity of observation prior is, in the Court's mind, insufficient to establish identification in this case, especially with the limitations of the video, which was black and white, it was nighttime, and faces and clothing type are not discernable.

**{¶23}** The State timely objected to the magistrate's decision, and the juvenile court sustained the objection. In doing so, it interpreted the compilation video to show "the unadulterated path D.B. took . . . and . . . him discharging a gun across the roadway. The Court cannot find the lack of defining characteristics or loss of continuity described in the Magistrate's Decision." The juvenile court accordingly adjudicated D.B. delinquent on all charges and all specifications.

**{¶24}** On January 9, 2024, the juvenile court committed D.B. to the Ohio Department of Youth services for an aggregate minimum period of two and a half

years, crediting the 127-day period he had spent in custody awaiting trial and disposition.

{¶25}  D.B. now appeals.

### *Sufficiency of the Evidence*

{¶26}  On appeal, D.B. raises two assignments of error.  First, D.B. argues that the juvenile court abused its discretion in admitting the compilation video into evidence.  Second, D.B. argues that his adjudications are not supported by sufficient evidence and are against the manifest weight of the evidence.  We begin with D.B.'s argument as to the sufficiency of the evidence, as it is dispositive of these appeals.

{¶27}  To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. *See State v. Curry*, 2020-Ohio-1230, ¶ 11 (1st Dist.).

{¶28}  D.B. was adjudicated delinquent of two counts of felonious assault in violation of R.C. 2903.11(A)(2), which states "No person shall knowingly do either of the following: . . . Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."  D.B. was also adjudicated delinquent of one count of discharging a firearm in a public place in violation of R.C. 2923.162(A)(3), which states "No person shall do any of the following: . . . Discharge a firearm upon or over a public road or highway."

{¶29}  The critical issue raised by D.B. on appeal is the identity of the shooter. "It is an axiom of the law that, to warrant a conviction, the evidence must establish beyond a reasonable doubt the identity of the accused as the person who committed

the crime." (Citation omitted.) *State v. Long*, 1995 Ohio App. LEXIS 5758, *8 (1st Dist. Dec. 29, 1995).

**{¶30}**     D.B. asserts that too little evidence was presented to establish the identity of the person who shot the gun that penetrated the complaining witness's vehicle and leg.  To be sure, no witness was able to specifically identify who shot the complaining witness.  Neither she nor her boyfriend nor any of the bystanders at the BP were able to say who fired the shot.

**{¶31}**  To begin, we are uncertain that the shooting depicted in the Washland video clip is the shooting that injured the complaining witness.  The complaining witness testified that she heard three shots, but the Washland video clip depicts only one muzzle flash.   In addition, Shideler testified that he recovered shell casings at the intersection of Warsaw Avenue and Glenway Avenue.  However, neither Shideler nor any other witness connected these casings to the bullet that entered the complaining witness's car and leg, nor did they link the casings to any particular firearm.  Thus, there is a fair question in this case as to whether the events depicted in the compilation video are those that led to the complaining witness's injury.  But taking the evidence in the light most favorable to the State, as we are bound to do, we draw an inference that the muzzle flash in the Washland video was the shot that injured the complaining witness.

**{¶32}**  This leaves the question of the shooter's identity.  At trial, the State presented two pieces of evidence to establish that D.B. committed the shooting:  (1) the compilation video, and (2) his recorded statement.  We hold that this evidence is insufficient to establish his culpability.

{¶33} Based on our review, the compilation video does not demonstrate that D.B. fired the shot that penetrated the complaining witness's leg. The footage of the actual muzzle shot is from a distance and of extremely low quality. While it is possible to make out a figure in the video, the footage reveals no distinguishing characteristics that would enable an observer to determine who the person is. And the State's evidence connecting the Washland video to D.B. is unpersuasive. For example, the State interprets the Washland video to depict a person wearing a dark top, light pants, and light shoes, the same type of clothing worn by D.B. on the Metro bus. But not even its own witnesses agreed with this description. Yenco testified that he believed the person in the Washland video was D.B. because he followed D.B.'s black shoes, while Conley testified that D.B. was the person in the video because he followed D.B.'s light-colored shoes. This discrepancy in testimony—and lack of agreement on precisely what the Washland video depicts—speaks to its lack of evidentiary value in identifying D.B.

{¶34} Moreover, even if the Washland video does depict a person wearing a dark top, light pants, and light shoes, Yenco admitted on cross-examination that several other individuals who appear on the BP video clip were wearing similar clothing. After extensively reviewing the Washland video, we are unable to discern if the person in the video is D.B., one of these other individuals from the BP, or someone else entirely.

{¶35} A further factual problem exists with the time stamps on the compilation video. The initial Metro bus clip shows D.B. on the bus from 22:55 to 22:55:30. The BP footage then shows four individuals exit from the Metro bus at 23:50:29. But the Washland clip indicates that the muzzle flash took place at

22:45:39, before D.B. got off the bus. Yenco testified that the time stamps on the compilation video were off, but he was not able to explain why or in what way. Thus, according to the evidence presented by the State, D.B. could not have been the shooter, because at the time of the shooting recorded on the Washland video, he was still on the bus.

{¶36} This leaves only D.B.'s statement to police. In his interview, D.B. did admit that he rode a Metro bus to the BP the night of the shooting and that he got off of the bus near the BP. He indicated that a group of people in a car arrived at the BP and that these individuals had previously tried to "jump" him. D.B. indicated that he walked away from the BP in the direction of Washland. At most, this places D.B. in the vicinity of the shooting. But mere proximity to a crime is insufficient to prove guilt. *See State v. Kleybort*, 2003-Ohio-1162, ¶ 36 (8th Dist.).

{¶37} When looking at the evidence in the light most favorable to the State, the record is devoid of sufficient evidence connecting D.B. to the shooting. No witness identified D.B. as the shooter. Nor did any proof connect the shell casings found by Shideler to D.B. or even to the complaining witness's injury. The compilation video is of too poor quality to rely upon in determining D.B.'s culpability, and even the State's witnesses took away contradictory perspectives on the color shoes D.B. was wearing. The record also reveals a critical discrepancy in the time stamps on the compilation video that makes it impossible for D.B. to have been the shooter because he had not yet gotten off of the bus.

{¶38} On the record before us, we therefore hold that D.B.'s adjudications were not supported by sufficient evidence as to his identity. We accordingly sustain D.B.'s second assignment of error.

## *Conclusion*

**{¶39}** The State presented insufficient evidence of guilt in this case. We accordingly sustain D.B.'s second assignment of error, reverse the judgments of the juvenile court, and discharge D.B. from further prosecution.

**{¶40}** Our disposition of D.B.'s sufficiency argument renders moot his argument that his conviction was against the manifest weight of the evidence. D.B.'s first assignment of error regarding the inadmissibility of the compilation video is also moot and we do not address it. *See* App.R. 12(A)(1)(c).

Judgments reversed and appellant discharged.

**CROUSE, P.J.**, and **WINKLER, J.**, concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.